460 Bish is now in session. The Honorable Justice Mary L. Mikva is presiding. Please have a seat. This is so exciting for us. For us, this is our first back in person for Justice Johnson. It's our first ever in person, so we're so thrilled to have you all here. How would you call the first case? Case number 1-21-1097, Prenprex, LLC v. Certain Underwriters at Lloyd's, London, Syndicates 2623-623. Thank you. Before we start, would both lawyers, beginning with the appellant, please give us your names for the record, whatever lawyer is going to argue, and also for the appellant, let us know if you'd like to reserve any of your 20 minutes for rebuttal. Good morning, Your Honor. John M. Aurelio for Prenprex. I'd like to reserve five minutes. You got it. Good afternoon, Your Honors. My name is Bryce Friedman, B-R-Y-C-E, for the appellant. Okay. Whenever you're ready, Mr. Aurelio, you may begin, and we will cut you off somewhere around 15 minutes so that you reserve part of your time. Thank you, Your Honor, and I'll apologize in advance. I'm getting over something not contagious. Well, all getting over something. It's not contagious, but if I'm a little short of breath, the pauses aren't just for dramatic effect. Good morning, Presiding Justice, and may it please the Court. There are two provisions at issue in this case, the media liability provision and the data and network liability provision. Now, at first glance, I'll be the first to admit that neither seem to apply. That was the impression I had when I first got this case. But then I kept reading through the policy, and I came across the headings provision, and that says that headings, titles of paragraphs, clauses, provisions, and endorsements are intended solely for the convenience and reference of the parties and do not limit coverage in any way and are not even considered to be part of the policy. So that means you have to look more closely at the actual terms of those provisions. And when you do, and you put those headings and, I think, our preconceived notions about what those headings would mean aside, I think you find coverage. Or at the very least, you find ambiguity that leads to a duty to defend. Can I stop and ask you one question, though, that I think comes directly from that? And I am sure I'm missing something because it would be very unusual for me to find something that you guys wouldn't. But in the exclusions of the policy, there's an exclusion for the unlawful collection or retention of personally identifiable information, which I think you all agree this was, or other personal information, but this exclusion shall not apply to claims expenses. Why is nobody talking about that, if you know? I don't know, Your Honor. Okay. I believe everything that we are disputing, however, would be considered a claims expense. Yes. And that's the only dispute, right, because there's been no finding of liability otherwise. Against Rempex. Yes. Yeah, although I think, you know, you'll see the BNSF case on appeal at this court shortly. I'm sure there's more to come. Yeah. But in any event, I just, that seemed to me to be right on point. So you might think about it during their argument, if you have something to say in rebuttal. Obviously, I have the same question for the appellates. I'm just confused. But I will hear from you on the part that everybody has been talking about. Well, if you'd like me to go directly to the definition of a claim, because I think that's part of maybe what your question is getting at. No, I'm just saying this. I agree with you that the headings don't appear to be exactly what your claim is about. Sure. And I'm, but this language, this exclusion seems to be directly what your claim is about, and I'm just confused why nobody's talking about it. But we'll talk about what we were talking about, whichever, wherever you'd like to start. Very well, Your Honor. Thank you. I'd like to start with the media liability provision, which covers the violation of the rights of privacy of an individual committed by REMPREX in the course of disseminating media material to the public. Now, there's obviously a few elements to that coverage. The first is whether there's a violation of the rights of privacy of an individual that's been alleged. Clearly there is. I don't think there's any dispute about that. That's exactly what BIPPA is. The Supreme Court in Rosenbach said that's exactly what BIPPA is. So that takes us to whether there's been dissemination. I don't think that there's a serious question that dissemination was alleged here, transfer was alleged here. You obviously can't have dissemination without transfer. It's an integral part of disseminating something. The circuit court agreed with us on this point, and I don't think Lloyd's really puts its heart into contesting it. Now, they say that there's no allegation of transfer with regard to REMPREX in the BNSF lawsuit as opposed to the CN lawsuit, but then it cites an allegation in the BNSF complaint that does exactly that. So I don't think that's a real issue here. So the real issue is in the public. That's exactly right, Justice Walker and McFarland. So we'll go there. The term public isn't defined in the policy. Lloyd's had the opportunity to define it, and it didn't. So that means we need to look to the ordinary meaning of the term. That means we look to the dictionary. And when we do that, we see that there are multiple potentially fitting definitions here. One of them is simply an individual member of the public, or perhaps a group within the larger public, or a place accessible to third parties, like the railroads and their employees, or groups of people having common interests and characteristics, again, like the railroads and their thousands of employees. Are you just citing dictionary definitions here?  But there's not some specific dictionary definition you're directing us to. Merriam-Webster, Oxford, dictionary.com, whatever you prefer, Your Honor. I think you'll find they all say more or less the same thing. You believe that there are many definitions. There are. And because there's ambiguity, that ambiguity has to be resolved in our favor as a matter of law, at least at this stage of the litigation. So one thing that I think really bears emphasis in that regard is the West Bend decision from the Supreme Court. Now, that was another BIPA insurance case, as the Court's aware, and the issue there was the definition of publication. The policy covered claims based on the publication of material that violated a person's right to privacy. And the Supreme Court said publication can't, which was undefined in that policy, publication can mean multiple things, so you had an ambiguity, so you resolve it in favor of the insured. Now, the words public and publication aren't exactly the same. I readily acknowledge that. They have the same root, and they're highly connected, but they're not the same. I think the relevance of the West Bend decision, the reason why it's instructive, is it provides the Court with a map of how you deal with these kind of interpretive situations. When there is an ambiguity, you resolve it in favor of the insured. In fact, way before West Bend. It does, but it's in the BIPA context, so I think it's a little bit, you know, germane in that regard. But that brings us to the data liability provision. Now, data breach, does this seem like a data breach? No, it doesn't, as I acknowledged at the beginning of the argument. But look at how the policy, how Lloyd's defined data breach, and that's as a loss of personally identifiable information in Brent Prex's care, custody, or control, or that of a third party, the railroad, for which Brent Prex is liable. Now, there's no debate, as Justice McVeigh, you said earlier, that biometrics is personally identifiable information. So that brings us to what the definition of a loss is. Loss with a lowercase L, and that's important, because loss with a capital L is defined elsewhere in the policy, but Lloyd's chose not to use that defined term here. They used it with a lowercase L. So, again, we go to the ordinary meaning of that term. And when we do that, when we look at the dictionary, be it Merriam-Webster, Oxford, or Dictionary.com, we find that loss means exactly what we think it means. What made it mean what they defined it as in the policy? What difference does it make whether it's lowercase or uppercase? Because when they use an uppercase letter, Your Honor, that signals that it's a defined term in the policy. So you go to the policy's definitions. When they use a lowercase, that signals that you use the word's ordinary meaning, but because it's not a defined term. And when you do that, when you look to the dictionary, you see that a loss can be being unable to keep or maintain something, harm or pervasion resulting from being separated with something, failing to maintain possession of something. Of course, that's precisely what the Supreme Court in Rosenbach said happens as a result of a BIFL violation. The right of the individual to maintain her biometric privacy vanishes into thin air. It's lost forever. That's a loss. So I think we have a clear case for coverage here. But even if the Court disagrees, we don't need to carry that burden. All we need to show right now is that there's some arguable possibility of coverage. And if we do that, then the circuit court needs to be reversed, in this case remanded, for the reinstatement of REMPEX's declaratory judgment action. Now, that brings us to the third issue that the parties briefed, and that's whether as a matter of law an insured like REMPEX must be a named defendant in an underlying lawsuit in order for a court to determine coverage in a declaratory judgment action. Now, that question only relates to the BNSF lawsuit, because obviously REMPEX was named as a defendant in the CN lawsuit. The circuit court here said that it was impossible for it to determine coverage because REMPEX wasn't named as a defendant in the BNSF lawsuit. That is simply wrong. As a matter of law, that's wrong. Now, I understand it's usually said and it's, you know, as a general rule that you compare the allegations of the underlying complaint to the language of the policy to determine whether there's coverage in a DEC action. But Illinois courts and New York courts don't say that's the only way to do it. In fact, they say the opposite. And we also have to remember the context of why we're here today. This is a 2615. So the court has to look to the allegations of the DEC action complaint and assume that they're true. Where does it say in any Illinois or New York authority that a court has to put on blinders or bury its head in the sand and ignore all surrounding circumstances and well-pled facts in the declaratory judgment complaint and focus solely on the underlying complaint? That law doesn't exist. Lloyd certainly doesn't point to it. There's no authority there. So that means that we need to look to things like the policy, first principles of insurance law, and those surrounding circumstances that I was just talking about.  And that's really what controls this debate here, I think. Claim is defined incredibly broadly in this policy as any written demand received by the insured, REMPREX, for money or services. Any demand. Written demand. Written demand. Now, Lloyd's could have defined that much more narrowly. Plenty of insurance policies do. Lloyd's could have said something like a claim is any lawsuit filed against the insured or something similar to that. They didn't do that here, and that must be held against them. What's the written demand you're relying on? Or are there several? There are several. Primarily, though, Your Honor, it's the railroad's defenses, written defenses in the BNSF lawsuit. So their answer, their affirmative defenses, their motion practice. In all of those, those are written statements by the railroad pointing the finger directly. Pointing the finger doesn't quite feel like a demand. But it implies their liability. It doesn't imply their liability. Yeah, it says their liability. It doesn't demand anything from them. Well, I think it does, Your Honor, especially when you do what the railroad did here, which is you argue that REMPREX was an indispensable party. So what's REMPREX saying when it's saying that REMPREX or I'm sorry, what's the railroad saying when it says that? It's saying that that case, the BNSF lawsuit, can't possibly be resolved without REMPREX being a named defendant in that lawsuit. So I think that is absolutely a demand, especially when the railroad says things like we're disclaiming all liability, we had nothing to do with this, this was all REMPREX, they're not our agent, which is everything they said in written statements there. And you also have, to your question, Your Honor, the demands by both parties in the mediation of REMPREX, that REMPREX monetarily contributes to a potential settlement. I don't recall in the record anything in writing from that. Well, Your Honor, I think that's a very good point, because Lloyd says that those representations were oral, but when you look at page 450 of the record, REMPREX didn't specify whether those demands were written or oral. And since we're here under section 2615, that needs to be interpreted in a light most favorable to REMPREX. And that means we have to assume, at least for purposes here today, that those demands were written. Generally, lawyers write a lot of letters. They did participate in settlement negotiations as well, correct? I'm sorry. They participated in settlement negotiations. They did. They did. The parties insisted that they did. And then insisted that they, you know, kick in some money for it. Those settlement negotiations ultimately failed. And they also responded to some discovery? Extensive and very expensive discovery, Your Honor. Did REMPREX request coverage from Lloyd's before engaging in the discovery and attending these mediation sessions? Yes, Your Honor, I believe they did. What your question may be getting at was the timing of the subpoena. One of the arguments that Lloyd raises in their response is that, you know, that we have a notice problem because we didn't notify them in time of the subpoena after it came in. That's absolute nonsense. I'm trying to think of a better word, a more polite word. I apologize. We engaged in that letter writing campaign with them that's, you know, extensively in the record. It's in our appendix. At the conclusion of that, they said, stop sending us documentation on this. The conversation's over. So, yeah, we didn't send them the subpoena. They told us not to. And now they're trying to hold that over our head for notice purposes. Because the claim had already been denied. Exactly. So I don't think that argument holds any water. Are we really going to conclude that having a party to a lawsuit, say, in multiple written pleadings, answers, affirmative defenses, pretrial motions, trial motions, that the insured is solely liable for what turned out to be a $228 million judgment, that that doesn't constitute a demand for money? That conclusion seems absurd to me, given all of the Illinois Supreme Court guidance on how these matters need to be handled and the assumptions that need to be made in favor of the insured and against the insurer. The question here isn't whether REMPREX was named as in the caption of an underlying lawsuit. The question is whether the written allegations by either side, although there are, I think, by both sides, implied REMPREX's liability, forcing REMPREX to start defending itself. And that's what REMPREX bargained for in this policy. And that's what the insurer wrongfully denied them. And that's what we're asking this Court to give us a chance to cure on remand. I think I'm going to stop you so you can reserve your time for rebuttal. Thank you, Your Honor. Good afternoon again, Your Honors. My name is Bryce Freedman. Thank you for permitting me to address the Court today and argue that the judgment below should be affirmed. I guess I should begin in response to Judge Mikva's question about the exclusion.   It's not an exemption. It's not an exemption. It's an exclusion on page C-508 of the record related to gathering or distribution of information. When I went to baby insurance school, I was always taught you start with the insuring agreement before you get to the exclusions because the underlying claim has to be within the coverage provided by the insuring agreement. We're starting with the media liability and the data breach insuring agreements here, and the argument is that there is no coverage because what the REMPREX says is an underlying claim doesn't fall within those provisions. This exclusion isn't only directed to these insuring agreements. There is regulatory coverage. So if the government came and asked REMPREX for information about various activities that REMPREX engaged in, this provision would pay claim expenses if it otherwise fell within that exclusion, but it doesn't pay claim expenses even in this circumstance because the underlying claims against REMPREX don't fall within the insuring agreements. This isn't a circumstance where the government has come and made an inquiry to them about the disclosure of personal data. But wouldn't claim expenses be covered if it's not covered by the policy, just like the government intervention would be included? Would it be included as a claims coverage? If the exclusion – if the – no. The answer to that is no. If the insuring agreement is never triggered, if there's never any coverage, you don't even read the – you don't even need to get to the exclusions. You only get to the exclusions if there is coverage. Got it. But – Go ahead. Okay, I understand your argument. You're not focused on that because you say no coverage so we don't have to worry about the exclusions. Correct. But sometimes we do read the exclusions to help us better understand what the coverage might be because why would you exclude something if there's no coverage? And so my question is, what does this exclusion apply to? Where is there coverage where this exclusion – And that's what I was trying to answer, where, for example, if the district attorney  that we all hear about in the news every day says to a company, what happened? Who broke into your computer system? There's often a government investigation. That might be covered by the policy and subject to this exclusion, which will pay for the lawyers in that case but not for any, for example, damages that have to be paid. Right. And I agree with you and I understand that. Okay. But my point is that if there is a potential claim here, that's the first step. And we don't even get to the exclusions until we determine that. And there was a claim. Even though, and just take the one lawsuit, they were not a party, but there was a claim. And it's no different than if you have an accident in your vehicle and you're not sued because you were the middle car and the car who was in the front, they're suing the car who actually caused the damage, the third car. And then you become involved in that claim to respond to interrogatories, respond to discovery. You would expect your insurance company to step in and protect you. Respectfully, Justice Walker, as I understand the question, I must disagree because this is a different kind of insurance. Once you disagree, I want you to disagree. Yeah. I want you to reply. I want you to let the state know. Allow me to explain. This is not a general commercial liability policy. This is not a general automobile policy. Those kinds of policies respond to occurrences. And that's, for example, what was dealt with in the West Bend case. So an occurrence meaning an accident, the car accident. This is a claims made with a capital C insurance policy. That is the trigger that provides any coverage no matter what for anything. And that is, with a limited exception, not applicable here. So if you look at the insuring agreement, it says that with respect to data breach, this policy pays damages and claim expenses, which the insured is legally obligated to pay because of any capital C claim against the insured during the policy period. It says the same thing with respect to the media liability. So a capital C claim requires what the panel was just discussing with my adversary, which is a written demand for money or services during the policy period. So in your car accident example, just because you were in a car accident doesn't trigger coverage under this policy. Under a claims made insurance policy, and there's legions of law about this. When they contact you to let you know that they are now being asked to pay out money, participate in settlement negotiations, you're saying that still doesn't get you to a claim. That's your argument, correct? My argument is if they don't have a written demand, which for money or services, and believe me, if they had one, it would be before the court. We wouldn't be talking about this. But you also didn't allege that originally that there was no written demand. You didn't deal with that issue. Neither one of you did. So that's still an open issue in this case. Is that correct? No, that's not correct. Okay. That was argued below. And the court below in the oral ruling said there is no demand, so there is no claim. Those are not her exact words below, but that was the essence of the decision with respect to the BNSF matter. So there are two underlying matters. One we're calling CN, standing for Canadian National Railroad, and one called BNSF, called Burlington Northern Railroad. Rempex was sued, sued in the old-fashioned way, in the CN litigation, and so that's a written demand for a service. They were served with a complaint. In the Burlington Northern case, they were not sued. There was no letter that the lawyer wrote to them that said you're liable. There's nothing like that at all. Nothing in the record and nothing that exists. What about the deposition subpoenas for the deposition? A subpoena, and again, is not a written demand for money or services. So this is you better show up and give your testimony that's got a service? There is no case cited, and none that I'm aware of, that has ever found that's applicable here that a subpoena is a demand for services. There are insurance policies that will cover various things like that, but there is not a written demand for services. I would never heard a deposition being described as a service, as opposed to giving information. In fact, we cite a case, I believe it's a New York case, because this policy says it's governed by New York law, that specifically says a request for information from a lawyer is not a demand for services, it's a request for information. I mean, if a client wrote me a letter and said can you please defend my deposition, that might be a request for services. So wouldn't the insurance company want to be involved, even if it's under a reservation of rights, just to make sure that their interests are protected? If they know that there's documents floating around in discovery, which is basically saying that your client was responsible, wouldn't that be a reason that you would want to be involved? I mean, you could certainly posit a circumstance like that, but where there is no demand for money or services, the insurance company is not going to pay for a lawyer for you. This is not third party, you're involved, you witnessed an accident, and you're asked to be deposed, your insurance company doesn't provide a lawyer for you. It's more than that here, though. It's actually they're being accused of being responsible for all of this. They're not. There is no such accusation. In fact, that case was tried. We didn't know, though. We may know now because the case is resolved, but we didn't know at that point in time. Nobody was accused. There is no piece of paper, no lawyer letter, no complaint, no document, accusing them of being responsible for anything. And if there were, that would be in their record. There's nobody saying, please pay my money, you're responsible for this. The VNSF case was tried in the federal court in Chicago, it made the news, as you just mentioned, it's a hundreds of billions of dollars verdict. Rempex wasn't party to the case. Nobody said, you're liable. They were never party to the case. So it's bizarre. See, the only thing they're looking for right now is litigation costs, correct? I don't know what they're looking for, to tell you the truth, because they were never party to the case. It doesn't make a lot of sense. So let me ask you this. What, besides a actual lawsuit, would you think would fall within claims made? Oh, it happens all the time, every day of the week. You get a... A demand letter? A demand letter. Happens every day of the week. Your client harmed my client that way, please make good and pay them whatever they owe. And thankfully, most of those don't make it to the courthouse, but that literally happens every day of the week. But just because they somehow heard that there was another lawsuit going on that could one day theoretically have brought them in, doesn't make it a demand for claims or services to them. I mean, you could understand why an insurance company would require a claim for demand or services as opposed to, oh, I heard about a lawsuit in which I might potentially be involved in the future in order to trigger coverage. We've spent a good bit of time on this, but even if you found it to be a claim in the first place, in the BNSF case, which I don't think it is, there's additional problems with coverage on the BNSF case, which is what... The definition requires that they have done various bad things in order for that claim to be covered, but there are no allegations, there literally are no factual allegations against REMPREX in the BNSF case. So even if you think it's a claim, how could you possibly determine there's even a potential for coverage when it doesn't even mention REMPREX? Putting that aside, even if you say it's the exact same complaint as the Canadian national complaint, which does mention REMPREX, there are no allegations. The allegations in the BNSF case are even less. This transfer allegation that REMPREX says is equivalent to disseminate is not present in the BNSF case at all. So even if you believe that the allegations, forgetting about to the public point for a second, but even if the allegations of disseminating information were in the Canadian national case, those same allegations are not in the BNSF case. So literally, the BNSF case has nothing about BNSF that might trigger coverage in the first place. Let me just make a couple other points about the allegations. Quick hypothetical. So if REMPREX had not responded to the subpoena or attended the deposition and the court ordered them to appear, would you then have agreed that there was a claim? No, because a subpoena is not a written demand to REMPREX for money or services. Somebody appearing at a deposition is not a service by its common dictionary definition. There is no case law that supports that. Nobody has cited that and there are cases to the contrary. Appearing at a deposition is not a service. Unless somebody says, the lawyer demand letter is the classic example, aside from a litigation document. It's you are my client, please pay me money, please fix the roof on the house because the roof you put on is broken, doesn't work, or leaks. That's the demand for money, that's the demand for services. Appearing at a deposition, send me a copy of a document, even under court order is not a claim for money or services. It's not pure litigation insurance for any time you're anyhow involved in any litigation. And we never get to this, of course, if there's no cover. Correct. So maybe we should give you a chance to address it. I appreciate that. So let me just flag a couple things so they don't get lost. We're focusing on the in the public question in terms of why there is no coverage under the media liability provision, but I just want to, I don't want to give up what I think I was accused of doing on the dissemination question. Transferring information is different than the dissemination. All you need to know is to look at BIPA itself to understand that. Because there are two separate BIPA claims, 15B and 15D. And I might get this backwards, but the other defendants in the Canadian national case have a dissemination claim against them. I think that's 15D claim. Against REMPREX, there was only a 15B claim, which doesn't include dissemination. So if the words are going to be given that claim in ordinary meaning, you will not find a dissemination claim against REMPREX in the Canadian national claim. You will certainly find factual allegations that they transferred biometric data, but you will not find factual information that they transferred biometric data. But they disseminated the data. Is releasing, where's releasing? Releasing's not good? Releasing... There's no allegation... The allegation against REMPREX is they captured and obtained, collected and stored, used and transferred. That's it. There's no dissemination information. Transfer sounds like release, but whatever. Okay. But our policy... Okay. The next point... You're going to say your policy because you did say that it included transfers earlier. Our policy does not include transfers. Okay. The policy includes the following words, just so we're clear, and this is on page 505 of the record. Creating, displaying, broadcasting, disseminating, or releasing. I am transferring this pen from one hand to the other, but I'm doing none of the things I just mentioned. So you're not releasing the information? I am definitely not. But more importantly, on the to the public point, and I think there's two important cases here, and West Bend is one of them, as I'm sure the panel is familiar with, the Supreme Court adopted the opinion authored by Justice Mikva. I say that publication has two components. It has a component of to the public or to an individual. So those two things are different. And what is being done in this case is conflating publication with to the public. And so we know that to the public is a subset of publication that has to be to more than one individual. And here, the only possible alleged dissemination was from one counterparty to another. One individual to another. That is not the definition of dissemination to the public by any stretch of the words. The other case I would refer the panel to is Channel versus Prairie Ridge from the second district, which interpreted the word public use and said, and I'm quoting that case, the word public is unambiguous and means the aggregate of the citizens or everybody or the people at large or the community at large. End quote. But that's Channel versus Prairie Ridge. That sort of use and plain and simple and ordinary use of public does not bring them within the coverage. And this is particularly important because Travel went on to say in a county with a population of roughly 300,000 people, the media kit might have been distributed to 27 businesses and four individuals, all of them either current or potential advertisers in the magazine. Under this scenario, we do not believe that the subject photograph, assuming that all 31 advertisers or potential advertisers saw it, was disseminated to the public. Okay? So the dissemination in that case was much broader than it allegedly was in this case when it wasn't to the public. This case is clearly not involving a dissemination to the public. Let me deal with a very narrow legal point here for a second. And that relates to the interpretation of insurance policies and I find it necessary to say this. Just because they come up with a dictionary definition of the word different than the one we use doesn't make the insurance policy ambiguous. Every single word, this depends on how dictionaries make money. Every single word in the dictionary has multiple definitions. Just because a word has multiple definitions doesn't make it ambiguous. When you interpret... But couldn't certain underwriters have defined that word? I guess, sure. We could have defined every single word in the policy. That would be impossible. So when you don't and then there's confusion, then what do we do with that confusion? Well, there is no confusion because if you apply the plain and ordinary understanding of the terms and this is what the law requires, in the context there is only one reasonable reading. What my adversaries have not done is stand up here and explain to you how the policy works in total with their use of alternative definitions. Anytime you consider an alternative definition you need to use it in the context and say, does this thing still make sense? That is the only time this Court respectfully is allowed to find an ambiguity is when there are two reasonable readings. We have offered the only reasonable reading. They have offered no reasonable reading. The only reading they have offered is to remove the words to the public from the provision. They wanted to say anytime there is a dissemination or in this case transfer of information then that provision is triggered. That is their position. If one person gives it to another it is triggered. Well, there is some case law that says exactly that though where it is distributed to one person. That could be to the public. No, it says that is publication. This is a different word in this policy. We have to the public. In the West Bend case it said publication. This has distribution to the public. I am not referring to the West Bend case. There is case law that says that. It was disseminated to just one person but it could possibly be disseminated to the public. I don't believe any of those cases have been cited by the parties but I certainly trust your honor on that point. You are almost out of time and you want to address your other questions. My point on their data breach provision is the same. Again, they have offered no alternative reading. What they have suggested that be done with the data breach provision is read out three of the four lines in the provision. What they have said is that if somebody loses their personally identifiable information and then sues rent price, there is coverage. That is their interpretation of the data breach provision. But that is not what the data breach provision says. The data breach first, the first thing they omit is the fact that the data has to have been in rent price's control. Rent price didn't lose anything. Nobody came into their computer system, took out the data and it is lost. They have read that entirely out of the provision. The second argument they make, which is a new argument not based below, raised for the first time in their reply brief, is and I don't identify all the information and sued rent price, rent price is covered. So they read out of the provision, the requirement, there is two requirements, one that rent price has lost the data or somebody that is responsible for loss of data. So their employee is walking down the street and carrying the data in a suitcase, they get mugged and the data is lost. That is what the provision covers. It is not a catch-all provision that covers any liability that rent price may have for lost data. They can't read those provisions out. And again, they offered no alternative reading. All they said is just ignore every word in the data breach provision after the word that appears on page 501 of the record, after the word third party information. They would just stop reading there and say whenever there is a loss of data and rent price is sued, there is coverage. But that is not what the policy says. I realize I have gone over my time and I appreciate the panel's indulgence so thank you. Any questions before we sit down? It is a very interesting and complicated issue so we are happy to give you a little extra time. Thank you. Very much appreciated. Thank you. Thank you. Justice McPhil, you begin by asking about the exclusion. I would like to address that briefly. My first reaction is to the extent Lloyd wants to rely on that. Let us look at the definition for the exclusion itself the unlawful collection or retention of personally identifiable information or other personal information buyer on behalf of the insured organization. But this exclusion will not apply to claims expenses incurred in defending the insured against allegations of unlawful collection of personally identifiable information. As I said before, that is exactly what we're talking about here. We're talking about claims expenses that we've incurred defending against these two lawsuits or defending our interests against these two lawsuits. The other thing is I think the argument is premature here at this stage because we're in a 2-6-1-5. I think that argument would have more bite in a summary judgment position, but on the 2-6-1-5, right now, all we're looking at is a determination of whether there's coverage. As I said, I'm only reading it as a suggestion that there is coverage because of the exclusion because usually there's an exclusion where there's coverage. You try to carve out part of the coverage with an exclusion. That's why I thought it was relevant. I agree with you. Nor am I confused by it. My brother counsel said something that confused me. He said it over and over and louder and louder, and it confused me even more each time, which was that Reflex isn't being accused of wrongdoing by anyone and that there's not a single piece of paper in this record, direct quote, wrote it down, that's going to show Reflex being accused of wrongdoing. I wrote it down, too, and he said there's no demand, there's no claim, there's no, they're not being accused of anything, and that in order to have a claim, there's got to be some sort of a demand. Those are his words. Both parties in that lawsuit are accusing Reflex of wrongdoing. That's incredibly clear. In the railroad's affirmative defenses, answers, motion pleading, everything, the finger is being pointed only at Reflex. And counsel brought up what happened at that trial. The plaintiffs said that Reflex collected all this information, Reflex violated BIPPA, and Reflex was the railroad's agent, and therefore the railroad was liable. That was the plaintiff's case.  said, the railroad said, that Reflex did all this wrongdoing, yes, but they're not our agent. Everyone's pointing the finger at Reflex. I don't understand how my brother counsel could make that statement. The claim issue, though, the argument from the other side is that there was never any demand made upon Reflex. I understand that. And I would point the court to our well-pleaded allegations that there were demands in the mediation made on Reflex, and that those demands were never made upon Reflex.  the argument from the other side is that there was never any demand made upon Reflex. And the argument from the